IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 24, 2018

**STATE OF TENNESSEE v. THOMAS A. RYAN**

**Appeal from the Criminal Court for Sumner County**
**No. 701-2016        Dee David Gay, Judge**

_____

**No. M2017-01599-CCA-R3-CD**

_____

After entering guilty pleas to four counts of aggravated statutory rape, Defendant, Thomas A. Ryan, was sentenced to four years for each conviction. After a lengthy sentencing hearing, the trial court ordered the sentences to be served consecutively, for a total effective sentence of sixteen years and denied all forms of alternative sentencing. Defendant appeals his sentence to this Court. Because we determine that the trial court did not abuse its discretion in sentencing Defendant to an effective sentence of sixteen years, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which ALAN E. GLENN and ROBERT H. MONTGOMERY, JR., JJ., joined.

Lawren B. Lassiter (on appeal) and Walter H. Stubbs (at sentencing), Gallatin, Tennessee for the appellant, Thomas A. Ryan.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Counsel; L. Ray Whitley, District Attorney General; and Tara Wyllie, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

In October of 2016, the Sumner County Grand Jury indicted Defendant for eight counts of aggravated statutory rape based on his interactions with a fifteen-year-old friend of his daughter. Defendant negotiated a plea agreement to plead guilty to four counts of aggravated statutory rape. The State agreed to nolle prosequi the remaining

four counts of the indictment.  A transcript from the plea acceptance hearing does not appear in the record on appeal.

After accepting the guilty plea, the trial court held a lengthy sentencing hearing in order to determine the length and manner of service of the sentence.  At the hearing, Detective Scott Bilbrey of the Sumner County Sheriff's Office explained the manner in which the police came to question Defendant about his relationship with the victim.  Defendant's wife called the dispatch and reported Defendant as suicidal.  Defendant voluntarily went to the police station where he denied being suicidal.  At that time, police had information about a possible relationship between the victim and Defendant.  When confronted with this information, Defendant denied that he had a relationship with the victim, who was actually in another room at the police station.  The victim informed police that she had penile-vaginal intercourse with Defendant on seven or eight occasions, all of which were preceded by digital penetration of her vagina.  These encounters occurred over approximately a ten-month period when the victim was fifteen to sixteen years of age in various locations in Sumner County, including a local park and Defendant's daughter's bed.

The victim informed officers that in addition to having sexual intercourse with Defendant, she performed fellatio on Defendant approximately ten times and Defendant performed cunnilingus on her on one occasion.  The victim also admitted to sending nude images of herself to Defendant.  The images, which constituted child pornography, were found on Defendant's computer.  Defendant was not charged separately for any crime related to the possession of child pornography.

Defendant initially admitted to Detective Bilbrey that he was close friends with the victim but denied any form of sexual relationship.  Defendant met the victim because she was a friend of his daughter.  Defendant explained that he taught martial arts to young girls and showed them various techniques for protecting themselves against attack.  When Defendant was confronted with the victim's allegations, he admitted his involvement, claiming that he loved the victim and that his failing marriage led him to enter into this relationship with the victim.  Detective Bilbrey explained that both Defendant and the victim sincerely believed that they were in a legitimate relationship.

The victim read a letter at the sentencing hearing.  In the letter, the victim acknowledged that she "looked up to" and loved Defendant and that Defendant taught her to have confidence.  The victim explained that the relationship forced her into counseling for the last ten months.  The victim had "guilt and pain" associated with the relationship but felt "calm" because she was getting "closure."  She described the Defendant as a "coward" who possessed "child pornography" and "got off to the trauma of another girl." The victim did not think that she was Defendant's only victim.

The record contains victim impact forms from both the victim's mother and father. The forms indicate that Defendant's actions had a substantial and lasting impact on the victim's family.

Dr. Melinda Davenport conducted a psychosexual evaluation of Defendant prior to the sentencing hearing. She acknowledged that Defendant had not been the subject of a polygraph examination so she was relying solely on Defendant's responses to questions in making her recommendations and conclusions. Dr. Davenport initially determined that Defendant was being honest but eventually concluded that he expressed some characteristics of a martyr.

Dr. Davenport recognized that Defendant did not have a significant criminal history and no mental problems other than suffering from depression. In addition, Defendant did not have a history of substance abuse or a traumatic childhood. She explained that Defendant was a high school graduate with a two-year college degree. Defendant maintained a stable work history, but at the time had resigned from a long-time job presumably as a result of his arrest and subsequent guilty plea.

Defendant admitted to Dr. Davenport that his actions were illegal but explained that he genuinely loved the victim and did not want to hurt her. Dr. Davenport expressed concern due to Defendant's lack of understanding or acceptance that his relationship with the victim was inappropriate. Dr. Davenport described these behaviors as cognitive distortions. Dr. Davenport determined Defendant was at low risk to reoffend but that two "flags" gave her concern. First, Defendant admitted that he utilized pornography, searching things like "barely legal teens" and "jailbait." Second, Dr. Davenport was concerned by Defendant's behavior, specifically the fact that he engaged in teaching martial arts techniques to young girls. Dr. Davenport viewed this specific behavior as a kind of "fishing" for potential victims who "would go for his temptations." Dr. Davenport also expressed concern with the allegation that Defendant had provided alcohol to his daughter's friends, by teaching them to make rum milkshakes. Dr. Davenport noted that Defendant denied having an additional relationship with a second victim but noted that if another victim were discovered, Defendant would be classified as a high-risk offender. Dr. Davenport admitted that Defendant believed that he was actually a victim and attempted to "externalize blame" on his poor marriage.

Probation officer Susan Morrow prepared the pre-sentence report. Defendant scored low on the risk and needs assessment, but Ms. Morrow deferred to the conclusions of the psychosexual evaluation in order to evaluate whether Defendant was amendable to treatment.

Defendant's mother, Rita Adams, testified that Defendant had a normal childhood. She expressed difficulty with the thought of Defendant living with her if he were granted probation because of the sex offender registration requirements, like prohibiting the use of the internet. Despite the limitations that having Defendant at her residence would entail, Ms. Adams did not rule out the possibility of housing Defendant if he were released to probation or some form of alternative sentence.

Defendant testified that he met the victim in February of 2016. The victim was a friend of his daughter. The victim learned that Defendant was interested in Renaissance reenactment and made props and costumes as a hobby. The victim asked Defendant to make her a sword for a role-playing game. Their relationship started because the victim was interested in learning how Defendant made the props and costumes. At the time that he became friends with the victim, Defendant described his relationship with his wife as "numb." He and the victim became closer, talking on the phone or texting each other on a regular basis. Defendant testified that "one day [the victim] admitted she had feelings for [him] and [he] had to admit the same." By June of 2016, he and the victim were having sexual intercourse.

Defendant denied requesting nude photographs of the victim, claiming instead that she sent them on her own. Defendant denied sending the victim pictures of himself. Defendant explained that he was trained in multiple forms of martial arts. Defendant taught defense techniques to his daughter and her friends on a couple of occasions so that his "daughters [could] grow up to be strong, confident, able to defend themselves." Defendant denied being "on the prowl" and using self-defense training to further facilitate getting close to young girls. Defendant claimed that none of the girls ever complained that the training was inappropriate.

Defendant admitted that he made rum milkshakes, his favorite, and that he let his daughter have one when she turned eighteen. Defendant explained that his daughter's friends may have had part of a rum milkshake "once or twice."

Defendant explained that his marriage was not good and that his biggest concern after getting arrested was the fact that he committed adultery. He admitted, however, that he had searched for pornography for nearly ten years prior to the current offenses, using search terms like "teen doggie style" and "jailbait." Defendant explained that he had a "relatively normal porn habit." Defendant admitted that his relationship with the victim was not normal but denied any manipulation of the victim. When asked what kind of sentence he would like a defendant to have if the same thing had been done to his daughter, Defendant initially refused to answer. He eventually explained that he would have to "look at the situation." Defendant confirmed that he and the victim had sex

approximately the number of times alleged by the victim. He also admitted that he smoked marijuana approximately once a year.

At the conclusion of the hearing, the trial court considered the purposes and principles of the sentencing act. The trial court determined that enhancement factor (7) applied, that the offense involved a victim and was committed to gratify the Defendant's desire for pleasure or excitement. *See* T.C.A. § 40-35-114(7). The trial court commented that the application of this enhancement factor was "verified in the psychosexual report." The trial court also determined that Defendant abused a position of private trust, applying enhancement factor (14). *See* T.C.A. § 40-35-114(14). The only mitigating factor considered by the trial court was the recognition that Defendant had no prior record. The trial court also looked at whether the imposition of a sentence was justly deserved in relation to the seriousness of the offense. The trial court commented that a "sexual relationship with a forty-five-year-old and a fifteen-year-old" could not be "overlooked" because it was "serious." The trial court stated that the law was "for the protection of children and the good of society." The trial court discredited Defendant's argument that he was in "love" with the victim, calling it "baloney." The trial court told Defendant he could have exercised "control" and "walked away." The trial court also stated that it considered what an "appropriate" punishment would be for eight instances of digital penetration, eight instances of intercourse, and one instance of cunnilingus in order to prevent crime and to promote respect for the law. The trial court looked at, among other things, Defendant's potential or lack of potential for rehabilitation, noting that he was "on the prowl" and had "cognitive distortions," such as poor emotional regulation and self-management, poor social skills and problem solving, and a tendency to externalize blame and make excuses. The trial court concluded that a four-year sentence on each of the four counts was "the only sentence appropriate." The trial court determined that Defendant's actions were "wrong" and "if we don't take it seriously as a society and as looking at punishment, we're going down the tubes." The trial court found "that confinement [wa]s necessary to avoid depreciating the seriousness of the offense and to provide an effective deterrence to others likely to commit similar crimes." The trial court ordered the sentences to run consecutively on the basis that Defendant was "convicted of two or more statutory offenses involving sexual abuse of a minor, with consideration of the aggravating circumstances arising from the relationship between the Defendant and the victim, the timespan of Defendant's undetected sexual activity, the nature and scope of the sexual acts, and the extent of the residual, physical, and mental damage to the victim." The trial court determined that the victim came to Defendant because of the relationship she had with Defendant's daughter and their shared interested in Renaissance reenactment, a "relationship of trust." Defendant took the victim "to the dark side" during a two to three month period of time during which there were at least eight acts of intercourse, eight acts of digital penetration, eight acts of fellatio, and one act of cunnilingus for a total of twenty-five instances of rape. The trial court noted that if the

victim were only a few years younger Defendant would be charged with rape of a child and be subject to a sentence of twenty-five years on each count. The trial court commented about the residual effect on the victim that she was going to have to "deal [with Defendant's actions] for the rest of her life" and the effect on the victim's whole family. The trial court determined that the sentences would be served consecutively and in incarceration.

Defendant filed a timely notice of appeal.

*Analysis*

On appeal, Defendant insists that the trial court erred by sentencing him to the maximum sentence in the range on each offense and erred by ordering the sentences to run consecutively for a total effective sentence of sixteen years.[1] Additionally, Defendant argues that the trial court should have granted some form of alternative sentencing. The State counters that Defendant has waived any challenge to his sentence by failing to provide a transcript of the guilty plea hearing as part of the appellate record. Despite Defendant's deficiencies in preparing the record for appeal, the State contends that Defendant was properly sentenced by the trial court.

When the record establishes that the trial court imposed a sentence within the appropriate range that reflects a "proper application of the purposes and principles of our Sentencing Act," this Court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). The same standard of review applies to a trial court's decision regarding "probation or any other alternative sentence." *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012); *see also State v. King*, 432 S.W.3d 316, 325 (Tenn. 2014) (applying the same standard to judicial diversion). This Court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10. Moreover, under those circumstances, we may not disturb the sentence even if we had preferred a different result. *See State v. Carter*, 254 S.W.3d 335, 346 (Tenn. 2008). The party appealing the sentence has the burden of demonstrating its impropriety. T.C.A. § 40-35-401, Sent'g Comm'n Cmts.; *see also State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

Tennessee Code Annotated section 40-35-102(3)(C) provides that "[p]unishment shall be imposed to prevent crime and promote respect for the law by . . . [e]ncouraging

---

[1] Defendant will be automatically and statutorily eligible for parole after reaching his release eligibility date (30% of sixteen years), less sentencing credits earned and retained by Defendant. *See* T.C.A. § 40-35-501(a)(2), (c) and (m).

effective rehabilitation of those defendants, where reasonably feasible, by promoting the use of alternative sentencing and correctional programs that elicit voluntary cooperation of defendants[.]" Tennessee Code Annotated section 40-35-104(c)(9) authorizes a "sentence to a community based alternative to incarceration . . . ." Additionally, "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant should be considered in determining the sentence alternative or length of a term to be imposed," and "[t]he length of a term of probation may reflect the length of a treatment or rehabilitation program in which participation is a condition of the sentence[.]" T.C.A. § 40-35-103(5). On the other hand, sentences involving confinement should be based on the following considerations:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant[.]

T.C.A. § 40-35-103(1). Moreover, the sentence imposed "should be no greater than that deserved for the offense committed" and also "should be the least severe measure necessary to achieve the purposes for which the sentence is imposed." T.C.A. § 40-35-103(2), (4).

A defendant is eligible for probation if the sentence imposed is ten years or less. T.C.A. § 40-35-303(a). Although "probation shall be automatically considered by the court as a sentencing alternative for eligible defendants," the defendant bears the burden of "establishing suitability" for probation. T.C.A. § 40-35-303(b). "This burden includes demonstrating that probation will 'subserve the ends of justice and the best interest of both the public and the defendant.'" *Carter*, 254 S.W.3d at 347 (quoting *State v. Housewright*, 982 S.W.2d 354, 357 (Tenn. Crim. App. 1997)). A defendant who is sentenced as an especially mitigated or standard offender and who has committed a Class C, D, or E felony should be "considered as a favorable candidate for alternative sentencing options" if certain conditions are met. T.C.A. § 40-35-102(5), (6)(A). The guidelines regarding favorable candidates are advisory. T.C.A. § 40-35-102(6)(D).

As the State's brief aptly notes, the record does not include a transcript of the guilty plea hearing in this case. When a record does not include a transcript of the guilty plea hearing, this Court should determine "on a case-by-case basis whether the record is

sufficient for a meaningful review under the standard adopted in *Bise*." *Caudle*, 388 S.W.3d at 279. The trial court herein held a lengthy sentencing hearing at which the trial court heard testimony from both Defendant and the victim along with several other witnesses. Despite the absence of the transcript of the plea hearing, we deem the record herein sufficient to review Defendant's sentence.

In this case, Defendant was convicted of four Class D felonies and was not convicted of any of the offenses listed in the statute rendering him ineligible for an alternative sentence. In other words, Defendant was considered a favorable candidate for alternative sentencing. Defendant argues that the trial court improperly denied an alternative sentence by sentencing him without "consideration of the [sentencing] statute . . . fueled by raw emotion and rough judgment." The trial court determined that incarceration was in the best interest of Defendant in order to avoid depreciating the seriousness of the offense and to provide an effective deterrent to others. The trial court determined, and the record supported the finding that Defendant "groomed" the victim, inappropriately believed that he was "in love" with the victim, and took advantage of the victim's trust by engaging in various sexual acts with the victim while she was fifteen years of age and he was over forty. The trial court did not abuse its discretion in denying an alternative sentence and in ordering Defendant to serve his sentence of sixteen years in confinement. We recognize that this case was emotionally charged. In addition to the testimony about the sheer number of instances of aggravated statutory rape, the victim testified that she was emotionally traumatized and forever affected by Defendant's actions. The victim was attending counseling at the time of the sentencing hearing. It was also evident from the victim impact forms completed by the victim's father and mother that crimes herein had a substantial impact on the victim's family. Defendant has failed to establish an abuse of discretion and is, therefore, not entitled to relief.

*Conclusion*

For the foregoing reasons, the judgments of the trial court are affirmed.

_____
TIMOTHY L. EASTER, JUDGE

- 8 -